UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JOSEPH ANDREWS, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:20-cv-35-DBH |
| | ) | |
| DENIS McDONOUGH, *Secretary,* | ) | |
| *United States Department of* | ) | |
| *Veterans Affairs,* | ) | |
| | ) | |
| DEFENDANT | ) | |

DECISION AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

In this employment discrimination case, the plaintiff Joseph Andrews alleges that his employer, the Department of Veterans Affairs (VA), discriminated against him because of his sex and retaliated against him for reporting discrimination. He brings three claims under Title VII of the Civil Rights Act of 1964: disparate treatment, hostile work environment, and retaliation. The VA filed a motion for summary judgment on all claims. I find that on the discrimination claims there is no genuine dispute of material fact and the defendant is entitled to judgment as a matter of law, but on the retaliation claim there are disputes that preclude summary judgment. See Fed. R. Civ. P. 56(a). Therefore, I **GRANT IN PART** and **DENY IN PART** the defendant's motion for summary judgment.

## FACTS

I view the facts in the light most favorable to Andrews, the nonmoving party, and draw all reasonable inferences in his favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

Andrews worked as a registered nurse for the VA from April 2010 until July 12, 2017. Joint Stipulated Facts ("JSF") ¶ 1 (ECF No. 17). In the latter half of 2016, he was transferred from a post-traumatic stress disorder (PTSD) clinic to the Mental Health Clinic (the "Clinic") at the Togus VA Medical Center, which operated on a walk-in triage basis. Id. ¶¶ 2-3, 13. Also on the Clinic staff were: nurse manager Justin Castonguay (male), a psychologist (female), and other registered nurses and assistant medical support analysts (all of whom were female). Id. ¶ 4. Nurse manager Castonguay was Andrews's supervisor. Id. ¶ 5. Castonguay became concerned about Andrews's performance in August 2016 when Andrews was asked to administer a certain type of injection and said he was unable to do so because he was unfamiliar with it. Castonguay informally counseled Andrews about his concerns regarding the incident. Id. ¶ 33; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("SUMF"), Pl.'s Additional Facts ¶ 85 (ECF No. 34); Def.'s Reply Statement of Material Facts ("SMF") ¶ 85 (ECF No. 41).[1]

---

[1] The VA states that Castonguay asked a nurse to train Andrews in the procedure but that, when the nurse went to train Andrews, Andrews said he knew how to administer the injection. Def.'s SUMF ¶ 21 (ECF No. 29). Andrews says he had asked Castonguay for training several times, received training, and never declined an offer by a fellow nurse for training. Pl.'s Resp. to Def.'s SUMF ¶ 21; see Pl.'s Ex. 8 ¶ 1, Andrews Decl. (ECF No. 33-8). I take Andrews's version on the summary judgment motion.

2

In October 2016, the Clinic implemented a new Same Day Access program, requiring the psychologist to take over the triage role formerly performed by the registered nurses. JSF ¶ 14. The psychologist had previously worked in a primary clinic with scheduled patient appointments, and she resisted her new triage role. Id. ¶ 15; Def.'s SUMF ¶ 6 (ECF No. 29); Pl.'s Resp. to Def.'s SUMF ¶ 6. The psychologist refused to follow Clinic protocol; yelled and swore in the hallway and during meetings; sent sarcastic, demeaning messages to the Clinic's group instant message chat; twice pointed her finger in Andrews's face; and once put her hand in his face and told him to "talk to the hand." JSF ¶ 21; Def.'s SUMF ¶ 15 (ECF No. 29); Pl.'s Resp. to Def.'s SUMF ¶ 15, Pl.'s Additional Facts ¶¶ 91-95.

Beginning in October 2016, Andrews and others in the Clinic raised concerns about the psychologist's behavior. JSF ¶ 24. Castonguay shared those concerns with the psychologist's supervisor. JSF ¶ 25; Def.'s SUMF ¶ 17; Pl.'s Resp. to Def.'s SUMF ¶ 17. Andrews met with Castonguay during the week of November 23 and discussed how the psychologist was mistreating him and refusing to follow protocol. Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 102; Def.'s Reply SMF ¶ 102. The following week, Castonguay asked Andrews to meet in the union office about an allegation that Andrews had slammed a door in an area where PTSD veterans were treated. JSF ¶¶ 34-35; Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 104; Def.'s Reply SMF ¶ 104. Andrews denied the allegation. Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 105; Def.'s Reply SMF ¶ 105. On December 9, 2016, Castonguay issued Andrews a "proposed admonishment" for slamming the door and for asking coworkers if they had

turned him in for slamming the door.  JSF ¶ 34; Joint Stipulated Record ("JSR")[2] Ex. A-12, Proposed Admonishment (ECF No. 18-13).  Amy Gartley, Director of Patient and Nursing Services, was the deciding official on the proposed admonishment.  JSF ¶ 36.  Andrews wrote to Gartley denying the proposed admonishment's allegations.[3]  Pl.'s Resp. to Def.'s SUMF ¶ 27; JSR Ex. A-13, Undated Letter from Andrews to Gartley (ECF No. 18-14).

Following the proposed admonishment, Andrews signed an abeyance agreement on December 22, 2016.  JSF ¶ 37.  The agreement held the proposed admonishment in abeyance if there were "no further infractions of . . . Inappropriate and or Disrespectful Conduct" or "Unnecessary, inappropriate or disruptive behavior of any type."  The agreement stated that failure to adhere to either of the criteria "during a twelve (12) month period . . . will result in the immediate issuance of the Admonishment," and that Andrews understood the agreement, voluntarily waived appeal rights with respect to the proposed admonishment, and entered into the agreement "voluntarily and without coercion."  JSR Ex. A-14, Abeyance Agreement (ECF No. 18-15).  Andrews says when he was given the abeyance agreement, he told the HR labor relations specialist that he felt uncomfortable signing.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 109.  He saw that it could lead to discipline and he did not have his union representative present.  Id.  Andrews says the HR representative pressured him to sign, saying that if he did not sign, the matter would go to

---

[2] The parties agree that the exhibits in the Joint Stipulated Record are authentic for the purposes of summary judgment.  (ECF No. 18).

[3] Andrews was particularly sensitive to the door-slamming accusation because he had previously raised similar concerns regarding door slamming.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 107; Def.'s Reply SMF ¶ 107.

Togus VA Medical Center Director Ryan Lilly and he would be fired.  Id. ¶ 110.

Gartley and Andrews's union representative also signed.  JSF ¶ 38.

On January 3, 2017, Castonguay emailed the female psychologist's supervisor, Gartley, and two other individuals, to say Andrews had reported that

> [the psychologist] continues to be passive aggressive on the [instant message] feed and refuses to see Veterans.  He stated that he has reported this to me 3 times with the behavior continuing and he feels harassed.  He has stated that if he made those comments or acted that way he would be dealt with.  Professional conduct between staff is an important Value to my management so I would have to agree with his assessment. . . . I will continue to report behavior of the Psychologist.

JSR Ex. B-1, Email from Castonguay (ECF No. 18-26); JSR ¶ 26.  The psychologist's supervisor emailed Andrews for clarification, JSF ¶ 27, requesting a summary of the following:

> "refuses to see Veterans"-dates and specific Veterans would be helpful for me
> "he has reported this to me 3 times with the behavior continuing"-the nature of the behavior that is repeated and continuing
> "he feels harassed"-the nature of the harassment that may be occurring

JSR Ex. N, Emails dated Jan. 4, 2017 (ECF No. 20-6).  Andrews replied, complaining that the psychologist refused to see Veterans and that he had "been told to triage Vets that should be seen by [the psychologist]."  Id.  He said, "I'm not sure why the majority of her requests are steered to me?"  Id.  His email did not mention harassment or discrimination based on sex.[4]

---

[4] The psychologist's supervisor met with her multiple times in late 2016 and early 2017 to discuss concerns.  JSF ¶ 29.  On March 9, 2017, he issued her a "written counseling" "to clarify what constitutes professional and/or inappropriate conduct."  Id. ¶ 30; JSR Ex. D-6, Email dated Mar. 14, 2017 (ECF No. 19-6).

In February 2017, Castonguay received a report that Andrews had refused to assist a coworker with patient care.  JSF ¶ 41.  Castonguay spoke with the coworker and shared findings with Gartley, who found the behavior alarming. Id. ¶ 42.  Gartley decided the behavior violated the abeyance agreement, and she issued Andrews an admonishment on March 1, 2017.  Id. ¶ 43; see JSR Ex. A-15, Admonishment (ECF No. 18-16).   Andrews left work after receiving the admonishment.  JSF ¶ 46.  Soon after, he requested and was granted Family and Medical Leave Act (FMLA) leave beginning March 6, 2017.[5]  Id. ¶ 47.  He says that while on leave he called Castonguay regularly, until Castonguay told him in mid-April that he did not need to call anymore until there was a change in his FMLA status.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 130. After the admonishment, Andrews did not return to work until July 2017.  JSF ¶ 46.

Andrews initiated EEO contact on March 22, 2017.  Id. ¶ 65.  On March 27, he met with an EEO counselor at the Office of Resolution Management and reported harassment, a hostile work environment, retaliation, and that management was not adequately responding to his complaints about the psychologist.  The office notified Togus director Ryan Lilly that Andrews had brought claims of sex discrimination and harassment.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶¶ 126-27; Def.'s Reply SMF ¶¶ 126-27.

---

[5] He requested leave due to "significant health effects from acute and chronic workplace stressors" including "tachycardia, anxiety and panic, nausea, sleep difficulty, poor concentration and productivity."  Pl.'s Resp. to Def.'s SUMF, Additional Facts ¶ 121; Def.'s Reply SMF ¶ 121; Pl.'s Ex. 6, Medical Records (ECF No. 33-6).

In late March, Andrews requested an accommodation to be relocated off the Togus campus due to work stress.   JSF ¶ 50; JSR Ex. A-16, Andrews Accommodation Request, dated Mar. 27, 2017 (ECF No. 18-17).  His request was denied in part because there were no appropriate nursing positions available elsewhere.[6]  JSF ¶ 52; Def.'s SUMF ¶¶ 34-35; Pl.'s Resp. to Def.'s SUMF ¶¶ 34-35.

Andrews filed an EEO complaint in mid May 2017.  JSF ¶ 66; Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 132; Def.'s Reply SMF ¶ 132.  The VA Office of Resolution Management accepted his claims for investigation in a June 23, 2017, letter copying Lilly.  Id. ¶ 67; JSR Ex. A-7, Notice of Acceptance of Claims (ECF No. 18-8).

On June 28, 2017, the VA sent Andrews a letter stating he had exceeded his maximum FMLA leave and was considered AWOL.  JSF ¶ 55; JSR Ex. A-19, FMLA letter, dated June 28, 2017 (ECF No. 18-20).[7]  Andrews received the letter July 5.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 136; Def.'s Reply SMF ¶ 136.  He returned to work the following day after getting clearance from his doctor.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 137; Def.'s Reply SMF

---

[6] The denial letter said that a reassignment would not "guarantee you won't encounter other challenging co-workers.  Health care is a challenging profession which can be and is stressful."  JSR Ex. A-17, Andrews Denial, dated Apr. 5, 2017 (ECF No. 18-18).  It also said "[w]e have appropriately dealt with" the coworker Andrews complained of.

[7] The earlier FMLA approval said: "There is a maximum entitlement of 480 hours (or 12 weeks if used continuously) of FMLA in a 12-month period. . . . Once the 480 hours of FMLA is used up or the 12-month period runs out, whichever comes first, any time that you take off without accrued sick leave may be charged to absence without leave (AWOL) if a request of AL [annual leave] or LWOP [leave without pay] cannot be approved due to operational needs.  AWOL is not a disciplinary action in and of itself, but it can serve as the basis for such action, up to and including removal from your position."  JSR Ex. A-18, Amended FMLA letter, dated Apr. 11, 2017 (ECF No. 18-19).

¶ 137.   By the time he returned to work, he had more than one month of unauthorized absences.  JSF ¶ 57.

On July 12, Gartley issued Andrews a "proposed removal" based on unauthorized absences and failure to notify a supervisor about absences.  JSR Ex. A-20, Proposed Removal, dated July 12, 2017 (ECF No. 18-21).  The proposed removal listed the abeyance and admonishment as "aggravating factors."  Id.  It said that "[t]he final decision to effect the action proposed has not been made" and gave Andrews the right to reply within 7 business days.[8]  Id.

The same day he received the proposed removal, Andrews submitted a written resignation, which took immediate effect to end his service.  JSF ¶ 62. The following day, Andrews wrote a letter to Togus director Lilly responding to the proposed removal, in which he said he was "forced to resign immediately under duress," that the proposed removal was "unfounded," and detailed how he had been subject to "harassment," "a hostile work environment," and "was retaliated against in the form of erroneous disciplinary actions."  JSR Ex. A-23, Letter from Andrews, dated July 13, 2017 (ECF No. 18-24); JSF ¶ 64.  Lilly replied in a brief letter: "Due to the fact that you voluntarily resigned your position . . . during the reply period and prior to a decision being made on the Proposed Removal, VA Maine Healthcare System has no intention of pursuing the matter further."  JSR Ex. W, Letter to Andrews, dated July 19, 2017 (ECF No. 21-6).

---

[8] The parties agree that a "proposed removal" is not a de facto removal but rather a proposal that an official may or may not follow.  Def.'s SUMF ¶ 56; Pl.'s Resp. to Def.'s SUMF ¶ 56.

On July 27, 2017, the VA Office of Resolution Management accepted for investigation additional claims from Andrews.  JSF ¶ 68; JSR Ex. A-9, Notice of Amendment of Complaint (ECF No. 18-10).  Andrews filed this federal lawsuit on January 31, 2020.  JSF ¶ 69.

## ANALYSIS

Title VII prohibits employers from discriminating "because of . . . sex."  42 U.S.C. § 2000e-2(a); see also id. § 2000e-16(a) (federal employees).  Andrews says his Count I includes both a claim that the VA intentionally discriminated against him because of his sex and a claim that the psychologist's harassment and the agency's inaction created a sex-based hostile work environment.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9 (ECF No. 33).  Count II alleges Title VII retaliation for being unlawfully disciplined and constructively discharged when he opposed and reported what he believed was unlawful discrimination.  See 42 U.S.C. § 2000e-3(a).  The VA seeks summary judgment on all of Andrews's claims.

### 1.  *Disparate Treatment*

Andrews's sex discrimination argument is that he was treated worse than the psychologist.  In his view, he was disciplined without justification and denied a transfer, while she was not disciplined for her conduct and was "rewarded" with a transfer.  He says, "plaintiff is a man so comparing himself to [the psychologist], a woman, is an appropriate comparator."[9]  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12.

---

[9] Andrews says that he and the psychologist were the only people on their team.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12; Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 86.  But Andrews already stipulated that there were "several RNs" in the Clinic.  JSF ¶ 4; see Def.'s Reply SMF ¶ 86.  I find his claim unsuccessful regardless.

On his prima facie case for disparate treatment, Andrews must show (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class received more favorable treatment.[10]  See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018).  The VA concedes on summary judgment that Andrews meets the first three elements.  On the fourth, it argues that Andrews is not similarly situated to the psychologist.

In assessing this question, I compare Andrews to the psychologist "in all relevant respects."  Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 60 (1st Cir. 2018) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)).  The "touchstone" is "[r]easonableness," the question being "whether a prudent person, looking objectively at the plaintiff and [his] comparator would think them roughly equivalent, and similarly qualified for the position."  Id. (cleaned up).  Although Andrews and the psychologist worked together, they held different positions (registered nurse versus psychologist), and the two had different supervisors and lines of command.  JSF ¶ 6.  There is no question that their training, roles, and forms of supervision were distinct.  Andrews has not presented evidence from which a jury could conclude that he and the psychologist were similar in all relevant respects.   As such, his sex discrimination claim fails at the prima facie stage.

---

[10] The First Circuit has observed that the requirements of a plaintiff's prima facie case "can vary depending on the context" and "must be custom-tailored to fit both the particular animus . . . and the particular type of employment decision involved."  Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 58-59 (1st Cir. 2018) (cleaned up).

### 2. *Hostile Work Environment*

The other half of Andrews's Count I is the claim that harassment by the psychologist and the VA's inaction created a hostile work environment based on sex.  At step one of the burden-shifting analysis, see <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), Andrews must establish six elements to prevail on hostile work environment sexual harassment: "(1) membership in a protected class and (2) unwelcome sexual harassment, (3) which was based on sex, (4) was sufficiently severe or pervasive, (5) was objectively and subjectively offensive, and finally (6) that some basis for employer liability has been established." <u>Gerald v. Univ. of P.R.</u>, 707 F.3d 7, 17 (1st Cir. 2013).  The VA argues that Andrews fails at least three of these elements.

The VA does not dispute the first element.  As to the second and third, there is insufficient evidence to show that actions by the psychologist or Andrews's supervisors were based on sex.  Andrews does not allege any inappropriate sexual touching or comments during his time in the Clinic, Def.'s SUMF ¶ 16; Pl.'s Resp. to Def.'s SUMF ¶ 16.  To be sure, conduct need not be "overtly sexual" to fall under Title VII.  <u>Xiaoyan Tang v. Citizens Bank, N.A.</u>, 821 F.3d 206, 216 (1st Cir. 2016).  But Andrews's claim fails because he has not shown evidence of sex-based animus.

Andrews points to his acquaintance with the psychologist three years earlier when she was an intern at Togus in 2013.  He says that he "rejected [her] sexual advances" then, and so a jury could find that he "bore the brunt of her mistreatment" in 2016-17 because of sex.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9; <u>see</u> JSF ¶ 8; Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 87; Def.'s

11

Reply SMF ¶ 87.  It is true that while personal dislike generally does not amount to sex discrimination, there are occasions where romantic rejection may amount to sexual harassment.  Oakstone v. Postmaster Gen., 332 F. Supp. 2d 261, 269-272 (D. Me. 2004) (examining 11th Circuit cases and concluding "there is a difference for Title VII purposes between non-gender based and gender-based harassment.  If the means for revenge is non-gender based, it does not trigger a Title VII response; if the means is gender-based, it does."); see also Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007) (citing Oakstone). But this is not one of those occasions.  Even assuming there is enough evidence to demonstrate past romantic rejection, there is no basis for a reasonable inference that the psychologist's actions years later were gender based.  And Andrews's own concern about working together given their past acquaintance does not make them so.  See Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 87; Def.'s Reply SMF ¶ 87.

Andrews points to an email that he says was from his supervisor Castonguay that suggests bias on his supervisor's part.  The email was to the psychologist's supervisor and others, and shared concerns about the psychologist's treatment of the medical support assistants.  It said in part: "I know we have talked about this but the girls do not deserve to be treated like this.  They do amazing work and should be treated like queens for all the work they do for us and our Veterans.  It is one thing for [the psychologist] to treat me like this for the last 6 months but it is not okay for her to do this with the girls." Pl.'s Ex. 5, Email dated Mar. 8, 2017 (ECF No. 33-5); Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 114.  But the email was actually from an administrative

officer, not from Castonguay.  See Def.'s Reply SMF ¶ 114.  It does not show that Andrews was treated with sex-based bias by his supervisor or by the psychologist.

Andrews also points to affidavits of three female medical support assistant coworkers made in the context of Andrews's EEO complaint.  One said the psychologist treated Andrews with "verbal hostility," used "obscene language," "refus[ed] to help him" with "walk in patients," and that "for whatever reason [she] treated Mr. Andrews with hostility and negativity."  Pl.'s Ex. 1 (ECF No. 33-1).  Another said the psychologist was "very hostile about [Andrews] and to him.  [She] would complain about him or deflect or refuse to see veterans and demand he take them.  [She] would get angry [with Andrews] over anything . . ."  Pl.'s Ex. 3 (ECF No. 33-3).  A third said that "most of the female nurses were pretty rude to [Andrews]" and his supervisor Castonguay did not treat him with respect.  Pl.'s Ex. 2 (ECF No. 33-2).  It also said the psychologist "was rude to everyone in [the] clinic.  She was pregnant and did not want to be in that clinic or doing what she was doing.  If she was having a bad day we were all made to have a bad day.  It was brought up many times . . ."

Andrews agrees that the psychologist was rude to others in the Clinic besides himself.  JSF ¶¶ 22-23; see JSR Ex. A, Andrews Dep. Tr. at 94-95 (Andrews stating that he had seen the psychologist yell at the clerks in the Clinic) (ECF No. 18-1); JSR Ex. A-10, Andrews EEO Aff. at 5 ("these clerks dealt with the same aggression and hostility from [the psychologist] when they would contact her to follow the . . . protocol.") (ECF No. 18-11).  But even assuming that the psychologist exhibited bad behavior more often toward Andrews than to

others, the evidence does not give rise to an inference that she did so based on Andrews's sex.  As the First Circuit stated in <u>Rivera-Rivera</u>, where the plaintiff alleged that she was subjected to screaming when her male colleagues were not:

> While we agree with Rivera that such behavior is (or at least should be) out of line in the work arena, we have nonetheless explained that "an employee claiming harassment must demonstrate that the hostile conduct was directed at [her] because of a characteristic protected by a federal anti-discrimination statute." <u>Quiles-Quiles [v. Henderson</u>, 439 F.3d 1, 7-8 (1st Cir. 2006)].  Rivera, however, has failed to connect her alleged harassment to gender at all.  Sure, she mentions that Eduardo and Pepín did not engage in the same type of screaming and yelling at male employees.  But that doesn't tell us much.  Indeed, there is a plethora of reasons Rivera's supervisors might have yelled and screamed at her (and not at their male employees) that have no nexus to her gender.  Simply put, Rivera has not done enough dot connecting for us to conclude that the harassment she alleges has as its basis her membership in a protected class—here, being a woman.

898 F.3d at 94.  That reasoning applies here.  Andrews has not put forward evidence from which a reasonable jury could infer that any harassment against him was based on his sex.  Summary judgment is appropriate on Count I.

### 3.  Retaliation

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).[11]   Andrews claims the VA unjustly disciplined and constructively

---

[11] The parties do not address whether Title VII's prohibition against retaliation applies to federal employees.  I will assume that it does.  <u>See</u> <u>Hernández v. Wilkinson</u>, 986 F.3d 98, 102 n.1 (1st Cir. 2021); <u>Morales-Vallellanes v. Potter</u>, 605 F.3d 27, 35-36 (1st Cir. 2010).

discharged him for opposing and reporting what he reasonably believed was discrimination.

When a plaintiff attempts to prove retaliation based on circumstantial evidence (as here),[12] McDonnell Douglas burden shifting applies.   Carlson v. Univ. of New Eng., 899 F.3d 36, 43 (1st Cir. 2018).   At step one, Andrews must make a prima facie case that (1) he engaged in protected conduct, (2) suffered an adverse employment action, and (3) there was a causal connection between his protected conduct and the adverse employment action.   Id.

Andrews says he undertook protected activity when he began reporting the psychologist's behavior to Castonguay in October 2016, continuing through when he later sought EEO counseling in March 2017 and filed his EEO complaint in May 2017.   He claims he suffered "adverse employment actions in the form of extra work, discipline and removal," Pl.'s Resp. to Def.'s Mot. for Summ. J. at 17, and that a jury could find causation due to "temporal proximity" between the protected conduct and adverse actions and also because the defendant's reasons for the adverse actions are "false," id.   The VA says that Andrews cannot prove his protected conduct began before his March 22, 2017, EEO contact and that he did not have a reasonable belief that he was the victim of illegal discrimination.   Def.'s Mot. for Summ. J. at 23-25.   It also contends that Andrews cannot prove but-for causation.

---

[12] The record provides no direct evidence of retaliation—for instance, communications among VA management saying they planned to punish Andrews for making complaints.   See Murray v. Walmart Stores Inc., No. 2:15-cv-484-DBH, 2019 WL 6689900, at *12 (D. Me. Dec. 6, 2019).

The VA says that Andrews's protected conduct did not occur until March 22, 2017 (when he initiated EEO contact). But protected conduct covers more than formal EEO contact. It includes among other things "making complaints to management." Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)). Further, an activity "need not be a Title VII violation so long as [the plaintiff] had a reasonable belief that it was, and he communicated that belief to his employer in good faith." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003).

Viewing the facts in favor of Andrews, I conclude a jury could find that Andrews's protected conduct began in 2016 and continued through his official EEO filings in Spring 2017. He first complained about the psychologist's behavior to his manager Castonguay in mid-October 2016. There is no evidence that he expressed a belief that he was facing discrimination based on sex at that time. But Andrews asserts that not long after, during the week of November 23, 2016, he told Castonguay in a meeting that he would have no choice but to file an EEO complaint because his concerns were not being addressed. Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 103; see JSR Ex. A-5, Pl.'s Resp. to Interrogs. at Page ID# 176 (ECF No. 18-6). The VA disagrees, citing Castonguay's statement that he "do[es] not recall ever being told by Andrews that he would have no choice but to file an EEO complaint," Def.'s Reply SMF ¶ 103; Castonguay Decl. ¶ 8 (ECF No. 23), but I credit Andrews's version for this summary judgment motion. In addition, although the language is not clear, a jury could decide that Castonguay's January 3, 2017, email to other managers

16

at the VA, which reported Andrews's concerns about the female psychologist and said "He has stated that if he made those comments or acted that way he would be dealt with" meant that Andrews had told Castonguay in good faith that he believed he was being unfairly treated based on his sex.  There is no dispute that his later EEO activity put management on notice of his sex-based claims.  In sum, a jury could find that Andrews's protected conduct began as early as November 2016, and continued through his EEO complaint in May 2017, and that his belief he was discriminated against was a reasonable one.

Next, Andrews must show he suffered one or more adverse employment actions.  I focus on Andrews's contentions that he suffered adverse employment actions in the form of his admonishment and constructive discharge.[13]  What constitutes an adverse employment action is broader for retaliation than for discrimination.  See Price v. Wheeler, 834 F. App'x 849, 858 n.6 (5th Cir. 2020) (citing Burlington Northern).  Unlike the substantive discrimination part of Title VII, the antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment."  Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st Cir. 2010) (quoting Burlington Northern, 548 U.S. at 64).  In order to show an adverse employment action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, 'which in [the retaliation] context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Id.

---

[13] In addition to "discipline" and "removal," Andrews's brief mentions "extra work."  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 17.  He does not flesh out what is meant by extra work.  If he is referring to his alleged increased workload due to the psychologist's behavior, that predated his complaints about her.  He presents no evidence that management punished him with additional duties following his complaints.

The test is objective, to be "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (quoting Burlington Northern, 548 U.S. at 71). Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington Northern, 548 U.S. at 67. I conclude for the purposes of this summary judgment decision that the admonishment[14] and proposed removal[15] could have dissuaded Andrews from reporting conduct he believed to be illegal discrimination and therefore are adverse employment actions.[16]

I also conclude that for summary judgment purposes, Andrews has established "but-for" causation. See Bostock v. Clayton County, 140 S. Ct. 1731, 1739-40 (2020); Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013). Close temporal proximity can demonstrate causation on a prima facie case. See Planadeball, 793 F.3d at 178-79 (two-month gap between protected conduct and adverse employment action); Sánchez-Rodríguez v. AT & T Mobility P.R., Inc.,

---

[14] See Sánchez-Rodríguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (assuming *arguendo* that an admonishment was an adverse employment action); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (calling a memorandum of admonishment an adverse employment action). But see Rayner v. Dep't of Veterans Affairs, 684 F. App'x 911, 915 (11th Cir. 2017) (doubting that an admonishment is *per se* materially adverse under Burlington Northern and turning to examine context); Poullard v. McDonald, 829 F.3d 844, 856-57 (7th Cir. 2016) (concluding that the plaintiff failed to explain what harmful effects flowed from the admonishment letter).

[15] There are occasions where threats of firing have been held an adverse employment action. See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 97 (1st Cir. 2018) (where plaintiff told on a repeated basis that she would be fired due to her protected conduct and ultimately resigned, there was a genuine issue of material fact as to whether there was constructive discharge); Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (1st Cir. 2015) (jury could infer that multiple firing threats could amount to a material adverse action). But see Price v. Wheeler, 834 F. App'x 849, 853 n.4, 858 (5th Cir. 2020) (proposed removal was not adverse employment action); McCullers v. Napolitano, 427 F. App'x 190, 196 (3d Cir. 2011) (same).

[16] I do not decide at this point whether Andrews was constructively discharged. For summary judgment purposes, I find adverse employment action even if he need not have resigned. The issue may become relevant for a jury in determining damages.

673 F.3d 1, 15 (1st Cir. 2012) (three-month gap).  Here, Andrews filed his formal
EEO complaint in mid May 2017.  JSF ¶ 66.  He received the proposed removal
fewer than two months later.[17]  The prima facie case is met.

On step two, the burden shifts to the VA to show a nonretaliatory reason
for the adverse employment actions.  Planadeball, 793 F.3d at 179.  It has done
so, pointing to Andrews's behavior that it says justified both the proposed and
the ultimate admonishment, and his unapproved absences that spurred his
proposed removal.  Def.'s Mot. for Summ. J. at 27-28.

Finally, on step three, the burden returns to Andrews to show that the
VA's assigned reasons were mere pretext for retaliation.  "To defeat summary
judgment in a retaliation case, a plaintiff must point to some evidence of
retaliation by a pertinent decisionmaker."  Planadeball, 793 F.3d at 179 (cleaned
up).  He must "raise a genuine issue of fact as to whether retaliation motivated
the adverse employment action."  Id. at 175 (cleaned up).  The pretext inquiry
looks at whether the employer believed its reasons were credible.  Ponte v.
Steelcase Inc., 741 F.3d 310, 323 (1st Cir. 2014).  It is not enough for the plaintiff
to "impugn the veracity" of the employer's reason.  Id. (quoting Mesnick v. Gen.
Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991)).  "[I]nstead, a plaintiff must proffer
specific facts that would enable a reasonable factfinder to conclude that the

---

[17] The proposed removal mentioned the admonishment.  I do not include the timing of the
admonishment itself, dated March 1, 2017, in this analysis.  Andrews says he did not *receive* the
admonishment until March 2, after he reported a March 2 incident where the psychologist
refused to treat a veteran.  Pl.'s Resp. to Def.'s SUMF ¶ 30; see Andrews Decl. ¶ 3.  The VA points
to paragraph 45 of the Joint Stipulated Facts, which says the admonishment was "given to
Plaintiff by Castonguay on March 1, 2017."  I find Andrews's declaration to conflict with the
stipulation on this point, and the stipulation controls.  See D. Me. Loc. R. 56(b) ("In the event the
parties file a stipulated statement of material facts, such stipulated facts shall control and take
precedence over any conflicting statement of fact filed by any party to the stipulation.").

employer's reason for termination was a 'sham' intended to cover up the employer's true motive."  Id. (quoting Mesnick).

Although it is not a strong case, I find Andrews has met this burden.  In doing so, I view the facts in his favor and keep in mind that when a plaintiff reaches the pretext prong, "courts must be 'particularly cautious' about granting the employer's motion for summary judgment."  Xiaoyan Tang, 821 F.3d at 222-23.

Andrews began complaining about the psychologist's behavior in October 2016.  He met with Castonguay the week of November 23 and told him the psychologist was refusing to follow protocol and was mistreating him.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 102; Def.'s Reply SMF ¶ 102.  Andrews says he told Castonguay that day that he would have no choice but to file an EEO complaint because his concerns were not being addressed.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 103; see JSR Ex. A-5, Pl.'s Resp. to Interrogs. at Page ID# 176 (ECF No. 18-6).[18]  It was just the next week when Castonguay asked Andrews to meet in the union office about an allegation from a coworker that Andrews had slammed the door in a PTSD treatment area,  JSF ¶¶ 34-35; Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 104; Def.'s Reply SMF ¶ 104, an allegation  Andrews denied.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 105; Def.'s Reply SMF ¶ 105.  He adds that he was particularly sensitive to door slamming because he had raised similar concerns himself in the past.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 107; Def.'s Reply

---

[18] The VA disagrees, saying that Castonguay "do[es] not recall" being told that.  Def.'s Reply SMF ¶ 103; see Castonguay Decl. ¶ 8.  I credit Andrews's version.

SMF ¶ 107.  The door-slamming allegations had a consequence; they formed the basis of Andrews's December 9, 2016, "proposed admonishment."  JSR Ex. A-12.[19]   Then, nearly two weeks after receiving the proposed admonishment, Andrews was called into the HR office without a union representative to sign an "abeyance agreement."  JSF ¶ 37; Pl.'s Resp. to Def.'s SUMF ¶¶ 108-09.[20]  The agreement said it would hold the proposed admonishment in abeyance if Andrews committed no further "Inappropriate and or Disrespectful Conduct" or "Unnecessary, inappropriate or disruptive behavior of any type" for one year, or else an admonishment would issue immediately.  JSR Ex. A-14.  Andrews says that he told the HR labor relations specialist that he felt uncomfortable signing the agreement but that he was told that if he did not sign it, he would be fired.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶¶ 109-110.[21]  A jury could find that the VA saw Andrews's complaints as troublemaking and that the door-slamming allegations were pretextual, allowing the VA to obtain the abeyance agreement on December 22, 2016, that it could then hold over his head.

But Andrews continued to report the psychologist's behavior.  In February 2017, Castonguay received a report that Andrews had refused to help a coworker with patient care.  JSF ¶ 41.  Castonguay investigated the report by speaking to the reporting coworker.  He reported the findings to Gartley, who found the

---

[19] The VA says that when Gartley met with Andrews to discuss the proposed admonishment, Andrews said he wanted a chance to do better.  Def.'s SUMF ¶ 26.  But Andrews denies saying that.  Pl.'s Resp. to Def.'s SUMF ¶ 26; see Pl.'s Ex. 8, Andrews Decl. ¶ 2.  I take Andrews's version.
[20] The VA disagrees and believes the union representative was present.  Def.'s Reply SMF ¶ 109.  I take Andrews's version for purposes of ruling on the motion.
[21] The VA disagrees, citing the declaration of the HR labor relations specialist saying that Andrews "did not tell [him] that he felt uncomfortable signing the agreement" and that he did not pressure Andrews to sign the agreement or threaten his job.  LER Specialist Decl. (ECF No. 39); Def.'s Reply SMF ¶¶ 109-110.  I take Andrews's version for purposes of the motion.

conduct "alarming."  JSF ¶ 42; Gartley Decl. ¶ 10 (ECF No. 22).  Gartley decided to issue Andrews the admonishment that had been held in abeyance.  JSF ¶ 43. Andrews was not informed of the nature of the complaint against him and was not asked questions or given a chance to explain before being issued the admonishment.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 119; Def.'s Reply SMF ¶ 119.  According to Andrews, the name of the coworker who reported him still remains a mystery, and there is no evidence in the file about the alleged "unnecessary and or disruptive behavior" referred to in the admonishment.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶¶ 118, 120; Def.'s Reply SMF ¶¶ 118, 120.

Later facts also support the potential of pretext underlying Andrews's treatment.  While Andrews was on FMLA leave beginning in March, he says he called Castonguay regularly until he was told he did not need to call anymore, whereas Castonguay says he only spoke with Andrews once and did not tell him that he did not need to check in with the VA regarding his leave.  Pl.'s Resp. to Def.'s SUMF, Pl.'s Additional Facts ¶ 130; Def.'s Reply SMF ¶ 130.  Andrews was initially granted FMLA leave beginning March 6, 2017.  JSF ¶ 47; see JSR Ex. A-18, Amended FMLA letter, dated Apr. 11, 2017 (ECF No. 18-19).  But the July 12, 2017, proposed removal said Andrews was AWOL "[f]rom on or about March 06, 2017 through March 17, 2017."  JSR Ex. A-20, Proposed Removal.  The VA says the proposed removal's mention of the period from March 6, 2017, through March 17, 2017, as AWOL was a "clerical error," Def.'s SUMF ¶ 54, but a jury would not necessarily agree and Andrews asserts there were additional flaws in

the calculations.[22]  Andrews wrote to Lilly the day after resigning.  JSR Ex. A-23, Letter from Andrews, dated July 13, 2017.  The letter expressed his concerns about discrimination and retaliation.  Lilly replied nearly one week later, saying that because Andrews "voluntarily resigned," the VA "has no intention of pursuing the matter further."  JSR Ex. W, Letter to Andrews, dated July 19, 2017.  Although Andrews did resign, a jury could find Lilly's refusal to respond to Andrews's discrimination and retaliation concerns to be further evidence of pretext—that Andrews's complaints of discrimination were trouble-making and that the VA was well rid of him.  Finally, in conjunction with the events described above, the close temporal proximity—(1) between Andrews's reporting of the psychologist's behavior in November 2016 and the allegations of door slamming against him and resulting proposed admonishment and abeyance agreement; and (2) between his May 2017 EEO complaint and his proposed removal fewer than two months later—can support an inference of pretext.[23]

For these reasons, I conclude that Andrews has satisfied his burden to produce evidence that the VA's assigned reasons were pretextual, and the VA's motion should be denied on this claim.[24]

---

[22] Specifically, Andrews claims that the VA's calculations in the evidence file fail to account for his "accrued annual and sick leave," that "the entire 'evidence file' is rife with errors and inconsistencies," and "his time for the week of March 27, 2017 through March 31, 2017 is charged as LWOP [leave without pay]."  Pl.'s Resp. to Def.'s SUMF ¶ 54; see JSR Ex. X Evidence file regarding Andrews proposed removal (ECF No. 21-7).

[23] I do not consider the temporal proximity between Andrews's March complaints and his admonishment for the reason explained in footnote 17.

[24] I note that Andrews raises in his response brief another piece of evidence that could speak to pretext, a positive performance review dated May 25, 2017, which covered the year from June 2016 to June 2017.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1-2.  The performance review rated Andrews "Satisfactory," which the form says means the employee "[h]as met all criteria, at times exceeds expectations."  Pl.'s Ex. 9 at 5-6 (ECF No. 33-9).  Ostensibly, it was written by Castonguay and signed by Gartley, and makes several favorable notes about Andrews's
*(continued next page)*

**CONCLUSION**

Viewing the facts in the light most favorable to Andrews, I conclude that a jury could not find in his favor on his sex-based disparate treatment or hostile work environment claims.  His retaliation claim, however, is fit for a jury.  I therefore **GRANT** the VA's motion for summary judgment as to Count I and **DENY** its motion with respect to Count II.

**SO ORDERED.**

**DATED THIS 26TH DAY OF AUGUST, 2021**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

performance, including that he "helped orient a new nurse to the clinic."  It does not mention any of the behavior for which Andrews had been disciplined.  However, I do not consider the performance review on this motion.  It is not in the parties' statements of fact, nor is it a part of the joint stipulated record (the parties stipulated to the JSR's authenticity), and the plaintiff has not provided a foundation for it.